# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALAN DICARA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:07-cv-00602 (VLB) |
| CONNECTICUT RIVERS COUNCIL, | : | |
| BOYS SCOUTS OF AMERICA, | : | |
| Defendant. | : | September 30, 2009 |

## MEMORANDUM OF DECISION GRANTING IN PART, AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. #50]

Before the Court is a motion for summary judgment filed by the Defendant, Connecticut Rivers Council, Boy Scouts of America ("CRC"). The Plaintiff, Alan DiCara ("DiCara"), brought this suit claiming that the CRC's termination of his employment and failure to accommodate an alleged disability violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. and the Family and Medical Leave Act (FMLA) 29 U.S.C. § 2601 et seq. The CRC argues that DiCara failed to set forth sufficient evidence that would permit a reasonable jury to find that the CRC: 1) terminated DiCara on the basis of a disability in violation of the ADA, or 2) failed to accommodate a disability in violation of the ADA, or 3) interfered with DiCara's right to medical leave in violation of the FMLA, or 4) retaliated against DiCara for exercising his right to medical leave in violation of the FMLA. For the reasons stated hereafter, the Defendant's motion for summary judgment is granted as to the Plaintiff's ADA claims, but is denied as to the Plaintiff's FMLA claims.

**Facts**

The following facts relevant to the Defendant's motion for summary judgment are undisputed unless otherwise noted.   DiCara was hired by the CRC in early 2003 as a part-time program coordinator and was appointed as a full time executive for the CRC's Learning For Life ("LFL") program on July 1, 2003. According to Harry Pokorny, the CRC's Executive Scout, the CRC is chartered by the National Council of Boy Scouts of America ("BSA") to provide BSA programming in the region.  The LFL is an "in-school values education program" that provides lesson plans and curricula addressing ethical issues and character development for teachers to use during their class periods.  The BSA developed the LFL program and provides LFL curriculum materials to its local councils, including the CRC.  [Doc. #57, Pokorny Deposition Transcript].

During the relevant time period, DiCara and his immediate supervisor, Tom McMahon, had the only two full-time positions in the CRC's LFL program.  DiCara focused on school-based programming, while McMahon focused on the LFL's work-site based "Exploring Program."  DiCara's responsibilities included marketing the program and securing participation by schools and organizations; servicing participating schools by, among other things, ensuring the delivery of LFL curriculum materials; and assisting with fund-raising for the program.

Between 2003 and 2005, funding for the LFL program decreased by approximately $126,500 dollars, and by the end of 2005 the LFL program had a loss of approximately $159,303.  The Plaintiff notes that this drop in funding was

2

due to the expiration of a short-time grant.  [Doc. #58].  Additionally, between 2004 and 2005, the number of participants dropped from 16,434 youths to 9,691, and the number of schools associated with the program decreased from forty to twenty-six.  The Plaintiff notes that this drop in participation continued after his termination and was a reflection of budget constraints facing participating organizations.  [Doc. # 58].

DiCara suffers from an irreversible, degenerative, arthritic condition in his spine that causes pain and numbness and restricts the use of his left arm and forearm.  DiCara notes that his physical impairment started as early as 2002.  Due to his condition, DiCara requested arrangements that would not require DiCara to personally deliver boxes of LFL materials to schools, that would reduce DiCara's travel to participating schools, and excuse DiCara from moving items of furniture during set-up for program events.  McMahon responded to DiCara's request by suggesting that DiCara carry books one at a time rather than all at once, and also suggested that DiCara use a luggage cart to deliver items.  The CRC contends that DiCara rejected McMahon's suggestion.  DiCara responds that the Plaintiff adopted some of McMahon's suggestions but attempted to identify alternative accommodations to better address pain related to his delivery of books.   DiCara further notes that he delivered books despite his spinal condition and the denial of his request for accommodation, and "received no assistance when delivering heavy boxes of books" and "delivered most books to most schools with no help from anyone." [Doc. #58]

3

DiCara elected to have surgery on December 6, 2005 to address his spinal condition.   The CRC granted DiCara the time that he requested for his surgery and recovery from the operation.  On or around December 16, 2005, the CRC's board of directors met to review a proposed budget for 2006, but did not approve it.  On January 5, 2006, DiCara's physician submitted a note to the CRC indicating that DiCara:

> . . . will be allowed to return to work with the following restrictions: no lifting over 15 lbs., and he is still recovering from the surgery he should not be driving more than 10 minutes at a time for the next 2-4 weeks. It is for this reason that I am suggesting, if he can do work at his home that he be allowed to do so for at least the next few weeks.

[Doc. # 57, Exhibit 3].  In response, the CRC allowed the Plaintiff to work from home after his surgery, and provided DiCara his full salary during his surgery and recovery.

The board met again on approximately January 13, 2006, and approved a revised budget that eliminated one of the two full-time positions with the LFL program.  On January 20, 2006, the CRC informed DiCara that the organization was eliminating his position, resulting in his termination, and that his last day of employment would be February 28, 2006.  DiCara was the only CRC employee who was laid off to address the entity's budget deficit; but the CRC notes that it also decided not to fill vacant positions.  [Doc. #57, Pokorny Deposition Transcript].

On May 24, 2006 DiCara's physician wrote a letter prescribing the following work restrictions:

4

> **"Alan is approximately 6 months post Cervical discectomy and fusion surgery.  He is able to work with the following restrictions: he may work full time hours, he has a lifting restriction of 15 lbs. maximum, he should limit any overhead work and may not do any over head lifting, if he does computer or desk work he should have an ergonomic work station."**

[Doc. # 57, Exhibit 4].  DiCara has testified that he still suffers from severe pain in his neck, shoulder, back, and upper arm, and both pain and numbness in his upper arm, hand, and finger [Doc. #57, DiCara Deposition Transcript].

### Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2005).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).  "The moving party bears the burden of showing that he or she is entitled to summary judgment."  Huminski, 396 F.3d at 69.  "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105

(2d Cir. 2002).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor."  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

DiCara's ADA discrimination and FMLA retaliation claims are governed by the McDonnell  Douglas standard:

> To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [test] laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). . . In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson v. New York City Dept. of Education, 457 F.3d 211, 215 (2d Cir. 2006).


Analysis of the Plaintiff's ADA Claim

To establish a prima facie case of discrimination under the ADA, DiCara must demonstrate that: (1) his employer was subject to the ADA, (2) he had a disability within the ADA's meaning, (3) he could perform the essential functions of the job with or without reasonable accommodation, and (4) he was terminated because of his disability.  Reeves v. Johnson Controls World Servs. Inc., 140 F.3d 144, 149-50 (2d Cir. 1998)  The parties agree that the CRC is subject to the ADA,

but disagree as to the remaining prongs for establishing a <u>prima</u> <u>facie</u> case of discrimination pursuant to the ADA.

As for the second requirement, the ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A-C).  DiCara claims that his spinal condition is a physical impairment that substantially limits his major life activities of working and lifting.[1]

The Second Circuit has encouraged deference to the Equal Employment Opportunity Commission's (EEOC) ADA regulations.  <u>Francis v. City of Meriden</u>, 129 F.3d 281, 283 n. 1 (2d Cir. 1997).  These regulations include physiological disorders affecting the musculoskeletal system within the definition of a physical impairment.  29 C.F.R. § 1630.2(h)(1).  Accordingly, DiCara's spinal condition qualifies as an impairment.  Additionally the EEOC regulations identify lifting and working as <u>per</u> <u>se</u> major life activities. 29 C.F.R. § 1630.2(l); <u>Reeves</u>, 140 F.3d at 150; <u>Zarzycki v. United Technologies Corp.</u>,  30 F. Supp. 2d 283, 287 (D. Conn. 1998).  The existence of an impairment is the first step in the analysis.

---

[1]  DiCara's Complaint notes that his ailment interferes with "major life activities including the major life activity of work." [Doc. #18].  The Plaintiff appears to broaden this claim in his Local Rule 56(a)2 Statement with references to an impact on his ability to sleep and recreate [Doc. #58].  To the extent that  the introduction of this added detail is not precluded, the Court notes that with respect to the functions of "sleeping" and "recreating," DiCara fails to demonstrate  substantial limitation of a major life activity. <u>See</u> <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 642-644 (2d Cir. 1998).

The Court must next determine whether DiCara's physical impairment caused him to be substantially limited in the identified major life activities. To determine whether an individual is substantially limited in a major life activity, a court should consider the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or expected long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2). The Second Circuit notes that this assessment should be individualized according to a case-by-case approach. Reeves, 140 F.3d at 151.

The Second Circuit's opinion in Colwell v. Suffolk County Police Dep't, 158 F.3d 635 (2d Cir. 1998), offers guidance for the Court's assessment of DiCara's putative disability. In Colwell, the Second Circuit considered whether evidence was sufficient to support a jury's finding that three police officers were disabled within the meaning of the ADA. Among the officers was Sergeant Abrams who suffered from a "'chronic degenerative disk disease of his neck and lower back'" that affected his range of motion and caused "headaches, backaches, neck pain, and pain radiating down his arms and legs." Id. at 639. Abrams' neurologist testified about the impact of his ailment on his ability to lift, push, and move objects, and explained that the Sergeant was:

> . . . certainly not capable of any physical confrontation . . . He is capable certainly of doing sedentary work, provided he had the ability to get up, change position. He can certainly reach over his shoulder, bend, twist, he can lift objects maybe ten to twenty pounds infrequently. He can stand and walk for short periods of time, maybe half an hour to an hour at a time. He is certainly capable of working an eight hour day with limitations."

Id. At 640.

8

The Second Circuit determined that Abrams' ten to twenty pound weight restriction did not qualify as a substantial limitation on the major life activity of lifting.  Based on this reasoning and assessments made in similar decisions, this Court finds that DiCara fails to establish that his impairment substantially interferes with the major life activity of lifting.  Colwell, 158 F.3d at 644; Zarzycki v. United Technologies Corp., 30 F.Supp. 2d at 289 (where the Court determined, despite the Plaintiff's ten to fifteen pound lifting restriction, that "[m]erely being unable to perform a discrete task such as heavy lifting does not mean plaintiff is substantially limited in the major life activity of lifting.")

The Second Circuit noted that when considering the major life activity of working:

> [EEOC] regulations make clear that the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working.  Accordingly, we have indicated that in analyzing whether a plaintiff is substantially limited in the ability to work, the kinds of jobs from which the impaired individual is disqualified must be carefully considered.

Colwell, 158 F.3d at 643 (citing 29 C.F.R. § 1630.2(j)(3)(l) and Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994) (internal quotation marks omitted).

In assessing Abrams' impairment, the Second Circuit concluded that the evidence failed to show that:

> . . . Abrams' limitations at work-including his inability to engage in physical confrontation-significantly restrict his "ability to perform either a class of jobs or a broad range of jobs. . .as compared to the average person having comparable training, skills and abilities."  Abram's impairment disqualifies him "from only a narrow range of jobs" (those

involving physical confrontation) and thus his impairment is not "a substantially limiting one."

Colwell, 158 F.3d at 644 (citing 29 C.F.R. § 1630.2(j)(3)(l) and Heilweil, 32 F.3d at 723).

The Plaintiff contends that DiCara's fifteen pound lifting restriction, when considered within the context of strength requirements for Machine Trade Occupations, demonstrates that he is precluded from heavy labor jobs and thus an entire class of jobs. DiCara's argument fails because the Second Circuit has explained that an assessment of an individual's putative disability must consider a plaintiff's qualifications and the job from which the plaintiff has been disqualified:

> EEOC regulations provide that an individual is substantially limited with respect to working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. section 1630.2(j)(3)(i)(1999). The regulations further elaborate on what is meant by a "class of jobs," § 1630.2(j)(3)(ii)(B), or a "broad range of jobs in various classes, § 1630.2(j)(3)(ii)(C), limiting the inquiry to the geographical area "to which the individual has reasonable access," § 1630.2(j)(3)(ii)(A). With respect to "a class of jobs," a court must consider "[t]he job from which the individual has been disqualified because of an impairment, and the number of jobs utilizing similar training, knowledge, skills or abilities." § 1630.2(j)(3)(ii)(B).

Bartlett v. New York State Bd. of Law Exam'rs, 226 F.3d 69, 83 (2d Cir. 2000).

Accordingly, we find that DiCara's physical impairment did not substantially interfere with the major life activity of working. DiCara's employment at CRC reflects knowledge, skill, and abilities related to marketing, fundraising, program development and managerial implementation, and a

10

background tailored to sedentary work.  As a result, heavy labor jobs that require repetitive lifting in excess of DiCara's weight restrictions do not reflect the preclusion of a "class of jobs" to DiCara.

Similarly, the Plaintiff cannot demonstrate that he has a record of an impairment that substantially limits a major life activity.  This provision requires proof that a "record relied on by an employer indicates that the individual has or has had a substantially limiting impairment . . . that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough." Colwell, 158 F.3d at 645 (citing 29 C.F.R. § 1630.2(k)). DiCara does not meet this requirement as the only record that the CRC relied on was a note from the Plaintiff's physician that asserts the very same facts and impairment that failed to meet the Second Circuit's standard for disability as defined by the ADA.  To be sure, the fact that DiCara underwent surgery and was hospitalized, is insufficient to create a record of a substantially limited impairment.  See Id. at 646.

DiCara may also prove "disability" pursuant to the ADA, by demonstrating that his employer "regarded" him as having a disability. Id. (citing Francis v. City of Meriden, 129 F.3d 281 (2d Cir. 1997)).  "It is not enough, however, that the employer regarded that individual as somehow disabled; rather the individual must show that the employer regarded the individual as disabled within the meaning of the ADA." Id.  DiCara is also unable to prove disability in this manner. The evidence on the record tends to show that the CRC was skeptical of DiCara's

claimed limitations and need for accommodation, and anticipated that DiCara could complete tasks related to his job, even when he noted concerns about moving heavy items.

As a result, DiCara is unable to prove that he is disabled within the meaning of the ADA and the Defendant's motion for summary judgment is granted as to the Plaintiff's claim of discriminatory termination under the ADA.

### Analysis of DiCara's ADA Discrimination Claim for Failure to Accommodate

A prima facie case that the CRC violated the ADA by failing to make reasonable accommodations requires proof that (1) DiCara is a person with disability under the meaning of the ADA; (2) the CRC had notice of DiCara's disability; (3) that DiCara could perform the essential functions of the LFL executive position with reasonable accommodation; and (4) the CRC refused to make the reasonable accommodation. Rodal v. Anesthesia Group Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004).  Because the Court has determined that DiCara's spinal ailment does not qualify as a disability within the meaning of the ADA, DiCara is unable to meet the first prong of his prima facie case.  As a result, the CRC's motion for summary judgment is granted as to DiCara's ADA reasonable accommodation claim.

<u>**Analysis of the Plaintiff's FMLA Interference Claim**</u>

DiCara also claims that the CRC interfered with his rights under the FMLA, and that the organization retaliated against him for exercising his rights under the FMLA.  "Under the FMLA, a plaintiff may raise separate causes of action for 'interference' and 'retaliation.'"  <u>Potenza v. City of New York</u>, 365 F.3d 165, 167 (2d Cir. 2004).  For his interference claim, DiCara:

> **need only prove by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate h[im].  [H]e can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. . . No scheme shifting of the burden of production back and forth is required.**

<u>Id.</u> **at 167-168.**

To assert a <u>prima facie</u> case for a FMLA interference claim, DiCara must show that: (1) he is an "eligible employee" under the FMLA; (2) that the CRC is an employer under the FMLA; (3) that he was entitled to leave under the FMLA; (4) that he gave notice to the CRC of his plan to take leave; and (5) that the CRC denied benefits that DiCara was entitled to pursuant to the FMLA." <u>Sista v. CDC Ixis N. Am.</u>, 445  F.3d 161, 167-68 (2d Cir. 2006).

To be an eligible employee, DiCara must have been employed by a covered employer for at least twelve months and have worked 1,250 hours during the twelve months prior to his leave.  29 U.S.C.A. § 2611 (2)(A).  Assuming, but not deciding, that the CRC is a covered employee, DiCara qualifies as an eligible employee due to the length of his full-time employment prior to the exercise of his leave.  The definition of eligible employee also excludes employees at

**13**

worksites where an employer employs less than fifty employees if the total number of employees within seventy-five miles of that worksite is less than fifty. § 2611 (2)(B).  Before deciding whether DiCara is precluded by this "50/75" eligibility rule, the Court must first determine whether the CRC and BSA have a joint employer relationship under the FMLA.

The FMLA defines an "employer" as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of the 20 or more calendar workweeks in the current or preceding calendar year." § 2611 (4)(A)(I).  The Department of Labor, the entity responsible for administering the FMLA, notes through its regulations that an entity may meet the FMLA's employee threshold by qualifying as a "joint employer." 29 C.F.R. § 825.106 (d) ("Employees jointly employed by two employers must be counted by both employers . . . in determining employer coverage and employee eligibility.")

The Second Circuit explains that ". . . in a 'joint employer' relationship, there is no single integrated enterprise.  A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly. Clinton's Ditch Co-op. Co. v. N.L.R.B., 778 F.2d 132, 137 (2d Cir. 1985).

The Department of Labor regulations offer examples of joint employer relationships:

> (a)  Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be

**joint employers under the FMLA . . . joint employment relationship generally will be considered to exist in situations such as . . . (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control over the employee, directly or indirectly because one employer controls, is controlled by, or is under common control with the other employer.**

29 C.F.R. § 825.106(a)(2-3).  Finally, the regulations advise that no single factor is controlling when determining whether a joint employment relationship exists.  Instead "the entire relationship is to be viewed in its totality." 29 C.F.R. § 825.106(b)(1).

The Second Circuit has acknowledged that "[a] joint employer relationship may be found to exist where there is sufficient evidence that [one entity] had immediate control over the other company's employees" and that "commonality of hiring, firing, discipline, pay, insurance, records, and supervision" are relevant to the determination of whether a joint employer relationship exists.  Woodman v. WWOR-TV, Inc., 411 F.3d 69, 89 (2d Cir. 2005) (citing Clinton's Ditch F.2d 132 at 137 (2d Cir. 1985) (internal quotation marks omitted)).

DiCara provides evidence of BSA and CRC's joint involvement in decisions affecting his employment.  The Plaintiff's employment letter, while signed by a Scout Executive of the "Connecticut Rivers Council, Boy Scouts of America" notes that his employment "has been approved by the Boy Scouts of America and the executive board of the Connecticut Rivers Council." [Doc. # 52, Exhibit D].  Similarly, DiCara's performance reviews were completed on BSA forms which were forwarded to the BSA after completion.  [Doc. # 57, Pokorny Deposition

15

Exhibits 1-2, 4].  Additionally, CRC consulted with BSA officials regarding DiCara's termination and completed a BSA "Request to Initiate the Termination Process" form, which includes a BSA declaration "I have reviewed the facts in this case and conclude just cause exists for termination of this employee, and I approve it."  [Doc. # 57, Porkony Deposition Exhibit 8].  Lastly, DiCara provides a letter that he received from CRC Scout Executive Harry Pokorny that states

> . . .we received a directive from the National Office. . .indicating that all council's participate in the Boy Scouts of America program in the same manner.  This means all councils must follow the BSA recommendation on what council is to pay for benefits and what employees must pay for benefits.

[Doc. # 57, Exhibit 1].  This evidence reflects that the BSA exerted a form of immediate control over CRC's employees and played a strong role in the hiring, firing, pay, provision of employee benefits such as insurance, keeping of records, and supervision of CRC employees.  Although the Defendant disputes the importance and context of the evidence of the BSA's involvement in CRC operations, DiCara has provided sufficient evidence for determinations by a reasonable fact-finder that would support a Court's finding that a joint employer relationship exists between the BSA and the CRC.

As a result, the CRC would qualify as a covered employer by virtue of its joint employee status with the BSA.  Both parties acknowledge that the CRC employed a minimum of thirty-eight employees during 2005 and a minimum of forty-one employees during 2006.  In turn, the BSA employed twelve individuals at scout shops located within seventy-five miles of the

CRC's principal place of business.  As a result, the CRC can meet the FMLA's minimum employee threshold, and DiCara is not disqualified by the "50/75 rule" at this summary judgment stage.

Upon establishing that both DiCara and the CRC are subject to the FMLA, the CRC only challenges the final prong of the prima facie case, that the CRC denied benefits that DiCara was entitled to pursuant to the FMLA. The Defendant claims that he was allowed to take all the time that he requested for his surgery, and received full salary during that time.  The FMLA however, also entitles an employee who takes leave under the FMLA "to be restored by the employer to the position of employment held by the employee when the leave commenced," or to return to "an equivalent position" with equivalent benefits and terms of employment. 29 U.S.C.A. § 2614(a)(1)(A-B). A reasonable trier of fact could determine that the CRC interfered with DiCara's rights under the FMLA by terminating the Plaintiff upon his return to work.  Furthermore, a trier of fact could reasonably determine that the CRC initiated termination efforts prior to DiCara's return due to the board's January approval of a revised budget that specifically, and only, eliminated one of the two full-time LFL program and did not result in the lay-off of any other CRC employees.  The board's decision to terminate DiCara's position occurred only after he provided a note from his physician that recommended that he stay at home for an additional two to four weeks.

The Defendant's motion for summary judgment regarding the Plaintiff's

FMLA interference claim is therefore denied.

### Analysis of the Plaintiff's FMLA Retaliation Claim

DiCara's cause of action for retaliation is analyzed under the McDonnell Douglas burden-shifting analysis.  Potenza v. City of New York, 365 F.3d 165, 167-168 (2d Cir. 2004).   To establish a prima facie case of retaliation in violation of the FMLA, DiCara must demonstrate that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the action occurred under conditions giving rise to an inference of retaliatory intent." Id. at 365 F.3d at 168 (2d Cir. 2004).

The record and the Court's earlier analysis of the CRC and BSA's joint employment relationship show that DiCara meets the first and third requirements of the prima facie case.

Additionally, DiCara's performance evaluations reflect that he was qualified for the position.  Each evaluation notes that DiCara was meeting "Expected Peformance" with the exception of a final evaluation that characterized DiCara as meeting the "minimum level acceptable in the position." [Doc. # 57, Pokorny Deposition Exhibits 1-2, 4].  This rating however, still demonstrates that Dicara was qualified for the position. Furthermore, the fact that this evaluation was completed on the same day that DiCara learned of his termination for budgetary reasons weighs against the

18

veracity of any claim that DiCara was not qualified.  Moreover, the Defendant has maintained that DiCara was terminated due to budgetary reasons and not due to his performance.

Lastly, DiCara meets the fourth requirement due to the temporal proximity between the dates on which he took leave and that his physician provided a letter to the CRC with recommended restrictions, and the dates on which the executive board decided to terminate DiCara's position, and informed DiCara of his termination.  See Weichman v. Chubb & Son, 552 F. Supp. 2d 271, 289 (D. Conn. 2008).  Accordingly, DiCara has established a prima facie case pursuant to the FMLA.

The CRC proffers a legitimate, non-discriminatory reason for DiCara's termination to rebut the presumption of discrimination established by the Plaintiff's prima facie case.  The Defendant contends that DiCara's position was eliminated due to budgetary restrictions that were caused by the loss of a major sponsor.  The CRC explains that DiCara's termination was part of its board's efforts to address its funding gap and that the 2006 budget reflected an elimination of DiCara's position and decision to refrain from filling vacant positions.  DiCara's role notably was the junior of the two LFL positions, and his position remained vacant for over two years.  The Second Circuit has recognized the CRC's explanation as a legitimate non-discriminatory reason for termination.  See Kron v. Moravia Central Sch. Dist., 5 Fed.  App'x. 60, 62 (2d Cir. 2001).

To survive summary judgment, DiCara must show that the CRC's proffered explanation for DiCara's termination is a pretext for discrimination. McPherson, 457 F.3d at 215.  There is evidence to support this assertion.

DiCara was the only employee laid off by the revised budget. Additionally, a document tracing the number of CRC employees reflects that the number of CRC employees increased significantly during the months after DiCara's termination.  [Doc. # 52, Exhibit L].  Similarly, DiCara's salary was approximately $33,000.00, while the deficit facing the CRC was approximately $160,000.00.  The termination of only DiCara's position and the subsequent additions to the staff during the 2006 fiscal year indicate that the CRC's explanation is pretextual.  This evidence, combined with the temporal proximity of the decision to terminate DiCara's position to his exercise of leave and the delivery of his doctor's note that identified his lifting restriction and need to work at home, would allow a trier of fact to reasonably conclude that the CRC's explanation is a pretext for retaliation due to DiCara's exercise of rights under the FMLA.

Accordingly, the CRC's motion for summary judgment is denied as to DiCara's retaliation claim under the FMLA.


Conclusion

The Defendant's motion for summary judgment [Doc. #50] is GRANTED as to the Plaintiff's ADA discrimination claims of wrongful termination and

20

failure to accommodate, and denied as to the Plaintiff's interference and retaliation claims pursuant to the FMLA.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  September 30, 2009

21